COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-06-253-CV

 

 

IN THE
INTEREST OF S.A., Z.A.,

AND S.A.,[1]
CHILDREN

                                                                                                        

                                              ------------

 

           FROM THE 323RD
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[2]

 

                                              ------------

I. Introduction








Appellants Emily and Michael, mother and father
of S.A., Z.A., and S.G., appeal the trial court=s order
terminating their parental rights to their children.  Emily raises five issues challenging the
factual sufficiency of the evidence to support the trial court=s
findings that (1) termination was in the children=s best
interest, (2) she exposed the children to environmental endangerment, (3) her
course of conduct endangered the children, (4) she constructively abandoned the
children, and (5) the Texas Department of Family and Protective Services
(referred to herein as ATDFPS,@ Athe
Department,@ or ACPS@) made
reasonable efforts to return the children to her.  Michael raises four issues, which correspond
to Emily=s first
four issues.  We will affirm.

II.  Factual and Procedural Background

Emily and Michael have been in a relationship
together for nine years.  During that
time, the couple had three children: 
S.A. was born September 7, 2001; Z.A. was born December 23, 2002; and
S.G. was born December 23, 2004. 
However, because Emily and Michael=s
relationship was marked by numerous changes in their residence, fighting,
criminal activity, and drug use, the Department removed their three
children.  Emily=s and
Michael=s
specific conduct is detailed below, along with the conduct of the children=s
grandparents because the grandparents were considered for placement of the
children.

 

 

 

 








A.     Emily=s
Conduct

At trial, Emily recounted the places that she had
lived in the past and said that she could have lived at as many as five
different places in the last year.  She
said that she is currently staying with a friend in Fort Worth and has been
there since Michael went to jail on May 21, 2006.  Emily=s
mother, Judy, testified that her daughter frequently lives with her following
fights with Michael. 








With regard to her relationship with Michael,
Emily said that there were only Aa few
occasions@ when their arguments were Areally
physical.@ 
She described an incident that occurred in 1999 in which Michael ended
up in jail for assaulting her.  Emily
said that Michael went to jail in 2000 after a stabbing incident that occurred
while he was under the influence of alcohol; later in her testimony, Emily
admitted that she had stabbed Michael because he had been out all night and had
said mean things to her.  Emily said that
in April 2006, she pushed Michael, tackled him to the ground, and took his
money.  Emily subsequently had to get a
leg brace because she injured her knee when she tackled Michael.  Overall, Emily admitted to hitting Michael
three times, but she said that she had never been arrested for assault/family
violence.[3]  Judy said that she would characterize Emily
and Michael=s relationship as violent and
stated that she had observed Emily hit Michael on more than one occasion. 

S.A. was nine months old when she ingested
methadone and was removed from Emily=s
care.  Emily testified that she was at a
neighbor=s house
on the phone with her grandfather and that although S.A. was in her care at
that time, she did not know that S.A. had ingested methadone. 

Emily testified that CPS removed Z.A. from her on
May 8, 2003.  However, she did not
explain the circumstances surrounding his removal. 

With regard to S.G., Emily said that she was
living with her parents after Michael went to jail.  Emily=s
parents brought S.G. home from the hospital after she was born.  Ultimately, Emily=s
parents asked her and Michael to leave the house.  After Emily and Michael moved out, Judy found
crack pipes and a crack spoon in their room. 
Emily said that CPS removed S.G. from her care on July 8, 2005. 








Officer Chris West of the City of Bedford Police
Department testified that he was dispatched on July 8, 2005 to a forgery in
progress that involved Emily and Michael. 
When he arrived, Michael, Emily=s brother,
and S.G. were in a car parked in front of a business, and Emily was inside
trying to pass a forged check.  A search
of the car revealed forged checks, narcotics, and drug paraphernalia.  Specifically, police found a glass pipe in
Emily=s
brother=s
pocket; a bag with methamphetamine in Emily=s purse;
a black sunglasses case on the passenger-side floorboard containing two
syringes; a Ziplock bag containing what appeared to be methamphetamine residue;
another pipe used for smoking methamphetamine; a digital scale; and a firebox
containing several passport-type photos of Michael and a checkbook belonging to
a man in Grapevine.  As a result of this
incident, police charged Emily=s
brother and Michael with forgery and charged Emily with forgery and possession
of a controlled substance of less than one gram.  Thereafter, all three adults were placed in
jail, and Officer West called CPS to get S.G. 
Emily testified, however, that the forgery charge had since been
dropped. 








With regard to Emily=s drug
use, she testified that when CPS removed S.A., she was not using drugs because
she was pregnant.  Emily admitted that
she had smoked marijuana while she was pregnant with Z.A., but said that was
before she had learned that she was pregnant. 
She said that she had undergone outpatient drug rehabilitation at a MHMR
clinic after she was charged with fraud for altering the number of pills on a
Xanax prescription.  Emily also said that
she had used methamphetamine and that the last time that she had used it was on
November 7, 2005, when Michael went to rehab. 
Emily said that she had relapsed on drugs Aoff and
on@ since
S.G. was taken from her.  Specifically,
Emily testified that she had overdosed on cocaine in April 2006.  She said that this was her first experience
with cocaine, and that it had been laced with PCP.  Emily admitted that she had been diagnosed
with substance abuse issues and that she has a continuing drug problem.[4]


Emily testified that she is bipolar,
manic/depressive.  Emily=s
pertinent past medical history includes head trauma, a history of physical
abuse, schizophrenia, and psychosis.  She
said that she is taking Zoloft, Seroquel, and Clonopin for her bipolar
disorder.[5]  She said that she does not take her
medications every day because she sometimes forgets.  She admitted that she had been taking
prescription medications while she also was using illegal drugs.

Because of Emily=s drug
addiction, she has never had all three children in her possession at the same
time.  She also said that none of the
children have come back to her home since they were removed. 

B.     Michael=s
Conduct








Michael admitted that during the last year, he
had lived in four residences.  Michael
said that he moved frequently because he likes to move and he did not have
possession of the kids.  He said that he
never had a stable environment growing up and that as a child he lived with
lots of different family members because he was a problem child.[6]


Michael admitted that he and Emily fight.  However, he said that he was not the
aggressor in any of the fights.  He said
that Emily=s testimony about their April
2006 fight was not true; Michael claimed that the last time he had a physical
altercation with Emily was seven or eight years ago when Emily stabbed him because
he had brought some women home.  He said
that S.A. was at Emily=s mother=s house
when the stabbing occurred and said that he and Emily did not fight while S.A.
was in their care; instead, he left if Emily became upset.  Michael also testified that he had been
jailed once before the stabbing incident when he bruised Emily=s arms
by holding her down to keep her from hitting him. 

Michael admitted that he hates the police and
that he acts violently toward them.  He
denied having an anger problem, however, and said that he has been through
anger management classes twice. 








With regard to his drug use, Michael testified
that he had been using drugs since he was fourteen years old; he is now
thirty-four years old.  He admitted that
he had used Aany and everything@ that
could get him high.  He said that he would
buy drugs and get high like people buy alcohol; he believes that because he
earns his money, he has a right to do with it what he wants.  He admitted that his dad and stepmother,
Bobby A. and Janet, had sent him to rehab when he was seventeen years old and
that he had been to rehab a total of five times.  He stated that his last full-time
recreational drug use was in November 2005, and then he went to rehab for
thirty days in 2005 and successfully completed the program.  Michael admitted that he had relapsed in
February 2006 by using cocaine and drinking alcohol.[7]  He stated that he does not consider his drug
use an addiction; instead, he just considers it Anormal
for [him].@ 
Michael testified that he does not currently have a drug problem.[8]  He explained that it is his intention to go
to church, not Narcotics Anonymous or Alcoholics Anonymous, because he gets
better results from church. 

Michael testified that Emily=s drug
use is not a major problem.  He thinks it
is okay for parents to use drugs when they have custody of their kids and that,
in the past, he did not think that a parent=s drug
use could put kids in danger because he was raised that way.  Now, however, because he has been to rehab,
he no longer believes that drug use is okay. 








With regard to his mental health, Michael
testified that he takes Seroquel and Zoloft, but that he had not been diagnosed
as bipolar. 

With regard to his criminal history, Michael
explained the forgery event in 2005 by saying that Emily had a money order, not
a forged check, and that she was cashing it for her brother.  He said that the drug-related items that the
police found in the car were fake and that is why the case was dropped.  Michael testified that he had been on
probation for the misdemeanor offense of domestic violence, and he had four
misdemeanor convictions for driving while intoxicated. 

C.     Grandparents= Conduct

1.     Maternal Grandparents








Judy, who is married to Bobby G., testified that
she had back surgery in 2003.  She
explained that she takes up to six Vicodin (hydrocodone) tablets a day and up
to three Soma per day, a muscle relaxer. 
Judy said that she had purchased about 1,080 pills during the past year
and has about 60 hydrocodone pills at her house.  She stated that she requires hydrocodone or
Soma for her back pain approximately three or four times a week.  Judy was having surgery the day following the
termination trial to help control the pain in her back and reduce the number of
pain pills that she requires.  She said
that she is also taking Nexium, Prednisone, Ambien, and Effexor, which her
psychiatrist prescribed for depression after her mother died.  Judy said that she keeps her medications
locked in a lockbox.  She said that she
would consent to a drug review. 

Judy admitted that she was on probation in 1999
for providing alcohol to a minor.  She
also admitted that she and Emily both smoke. 


Judy said that she had taken care of S.G. Aall
day[,] every day@ since S.G. was born.  However, Michael testified that Emily was
taking care of S.G. the majority of the time that the couple lived with Emily=s
parents.  

2.     Paternal Grandparents

Bobby A., Michael=s
father, testified that S.A. came to live with him and his wife, Janet, in
August 2001 and that Z.A. arrived at their house in May 2002.  Bobby A. testified that Z.A. was diagnosed
with Type I diabetes in December 2004. 
Bobby A. and Janet are very concerned about Z.A. and her care; they
found a church member who is a registered nurse from Cook Children=s
Hospital to take care of Z.A. during the trial. 








Bobby A. admitted that police raided his house in
June 2005.  During the raid, police found
drugs on his son=s girlfriend who was at the
house and found drugs in areas of the house inhabited by their son.  Bobby A. also admitted that he, Janet, S.A.,
and Z.A. all tested positive for methamphetamine after S.A. and Z.A. were
removed from he and Janet=s care following the drug
raid.  Bobby A. speculated that
over-the-counter medications that they were taking for illnesses could have
made the test positive.  Bobby A.
testified that he has never used illegal drugs and that he does not know why
Janet used marijuana in May 2005 at age forty-six or forty-seven.  

Bobby A. testified that he had allowed S.A. and
Z.A. to be in the company of his sons even though his sons have criminal
records.  He also testified that he would
continue to allow Michael and Emily to see their children at barbeques and
family gatherings if Michael and Emily were drug free.  Bobby A. said that he would also allow Emily=s
parents to see the children at barbeques and family gatherings.  Bobby A. said that he will watch S.A. and
Z.A. more closely than he did his own sons for signs of drug use. 

Janet testified that she has been married to
Bobby A. for twenty-seven years and that Michael is her stepson.  She testified that Bobby A. is a service
technician for General Electric Company and that he has been with the company
for twenty-eight years.  She said that he
makes approximately $68,000 a year and that she stays at home to care for S.A.
and Z.A.  








Janet admitted that she had used marijuana in May
2005 and while she was a teenager.  Janet
believed that she, Bobby A., S.A. and Z.A. tested positive for methamphetamine
after S.A. and Z.A. were removed because the drug was in the air vents or that
test results were bogus; she claimed that the lab that conducted the test was
not accredited by the Food and Drug Administration.  Because all of Janet=s
subsequent hair follicle and urine tests were negative, and because Bobby A.=s were
likewise negative, Janet believed the positive methamphetamine tests had to
have been erroneous.  She testified that
she has not ingested any illegal substances or prescription drugs (other than
those prescribed directly for her) since May 30, 2005.  Janet also pointed out that none of her drug
evaluations tested positive for marijuana.[9]


Janet explained that she and Bobby A. did not
originally request that S.G. be placed with them because they did not have a
relationship with her.  Janet testified,
however, that since then, she has had contact with S.G. when she brings S.A.
and Z.A. to visits but was denied further visitation with S.G. by court order. 

D.     CASA Volunteer=s
Observations








Paula Phillips, the Court Appointed Special
Advocate (ACASA@)
assigned to the case, testified regarding her interactions with Emily, Michael,
the children, and the grandparents. 
Phillips testified that she had been to Emily=s
parents= house
and that it is clean and that the room for S.G. is appropriate.  Phillips said that there is no indication
that Emily=s parents engaged in illegal
drug use.  

Phillips testified that during her second visit
to Emily=s
parents= house,
Emily was there.  Emily told Phillips
that she had outstanding warrants for her arrest for the offense of theft by
check.  Emily mentioned a drug overdose
and talked about the violence between her and Michael.  Phillips learned that a week earlier, Emily
had overdosed on medications and had gone to John Peter Smith Hospital to get
her stomach pumped.  Emily mentioned
stabbing Michael and said that she and Michael had fought a lot over their nine
years together. 

After visiting with Emily=s
parents, Phillips took Emily to the motel where she and Michael were
living.  When Michael opened the door, he
had a crack pipe in his hand and went to go hide it,[10]
and Phillips noted the smell of chemicals. 
Phillips testified that the motel where Emily and Michael were staying
was sleazy, filthy and not a place for children. 








During the one CPS visit between Emily and the
children that Phillips observed, Emily arrived late and missed visiting with
S.G.  To Phillips, it did not appear that
Emily was bonded with the children, and Emily said several times that she did
not know how to bond with S.A. and Z.A. 
When Phillips told Emily how to play with the children, Emily started crying
and said that she did not know how.  

Phillips said that Bobby A. and Janet had very
good interaction with the children, that they engaged in activities with the
children, and took them places.  Phillips
testified that a bond exists between the grandparents and the children.  Although Bobby A. and Janet=s three
boys are over age twenty and are now all incarcerated, S.A. and Z.A. were
removed from Bobby A. and Janet=s home
because one of the sons had an illegal substance that was found within a child=s
reach.  Phillips noted that neither Bobby
A. nor Janet were arrested or charged when the drugs were found in their
house.  S.A. and Z.A. subsequently tested
positive for methamphetamine.

Bobby A. told Phillips that he does not do drugs
and that he is subject to random drug testing because he drives a company
vehicle.  But Janet admitted to smoking a
joint in 2005 while she was at a party. 
Finally, Phillips believed that whatever Bobby A.=s and
Janet=s past,
they have straightened out for the sake of their grandchildren.  

With regard to the Kennemores, who are relatives from
Missouri who seek to have S.G. placed with them, Phillips stated that she had
no concerns with the placement of S.G. with them.  

 








E.     Compliance with Service Plan

1.     S.G.=s
Caseworker=s Synopsis of Compliance

Mary Jokisch, the CPS caseworker assigned to S.G.=s case,
testified that she discussed the service plan with Emily and Michael in early
August 2005 and gave them a copy. 
Jokisch said that the service plan required Emily and Michael to undergo
psychological evaluations, to attend parenting classes, to submit to drug and
alcohol assessments, and to attend individual counseling.  Jokisch stated that although she made appointments
for Emily and Michael and that the Department was paying for the classes, Emily
and Michael did not accomplish anything on the plan. 

Specifically, Jokisch said that she asked Emily
and Michael to take a urinalysis on August 8 and October 7, but neither took
the test.  Emily and Michael told her
that they could not find the place to give the urinalyses even though Jokisch
had given them the address and a map. 
Additionally, Emily had told Jokisch that she would not go to the first
urinalysis because it would come back dirty because she had been around people
who were doing drugs.  Jokisch=s
records also revealed that Emily and Michael did not show up for three of their
psychological appointments. 








Jokisch admitted that transportation was an issue
for Emily and Michael because they did not own a car, but she said that Emily
had told her that Emily=s parents would assist
them.  Additionally, Jokisch said that
CPS does not traditionally transport parents. 
Jokisch noted that Emily was able to get transportation to the visits
with her children but not to the services that she was required to complete. 

With regard to CPS=s review
of placing S.A. and Z.A. with Bobby A. and Janet, Jokisch testified regarding
the facts surrounding the removal of S.A. and Z.A. from Bobby A. and Janet=s home
following the drug raid.  Jokisch
testified that hair follicle testing was done within a matter of days or weeks
after the children were removed and that all four peopleCBobby
A., Janet, S.A., and Z.A.Ctested positive for
methamphetamine.  Jokisch said that Bobby
A. and Janet later tested negative for methamphetamine shortly after the test
that was positive and that all of their other drug tests were negative. 

With regard to CPS=s review
of placing S.G. with Emily=s
parents, Jokisch testified that the recommendation on Emily=s
parents= home
study was denied because Judy was taking pain medications and was not following
through with recommendations, including family therapy.  Therefore, CPS was considering Missouri
relatives, the Kennemores, for S.G.=s
placement. 

2.     Ongoing Caseworker=s
Synopsis of Compliance








Heather Jones, the ongoing caseworker for Emily
and Michael=s children, testified that Emily
Awas
pretty compliant with her visits@ and Atook a
couple of drug tests.@ 
Jones said that Michael came to four or five of the forty scheduled
visits and took one drug test that was court-ordered.  Jones stated that court-ordered drug tests
for Emily and Michael both came back dirty; Emily=s was
positive for methamphetamine and amphetamine, and Michael=s was
positive for methamphetamine.  During a
three-month period, Emily and Michael attended only two counseling sessions. 

With regard to transportation, Emily told Jones
that she would be moving to Fort Worth and that transportation then would not
be a problem.  Jones testified that Emily
eventually did move to Fort Worth and lived there long enough to complete her
service plan.  Jones stated that it was
up to Emily to schedule her services and that they had provided her with all
the phone numbers. 

Jones testified that Michael had held a job.  Jones said that Michael had completed a
parenting program in a prior case, as well as anger management classes, and he
had been frequently tested for drugs through the probation department.  However, she said that there was no proof
either way regarding whether he was clean and sober right now.  Jones gave her opinion regarding how often
Michael had moved and said that she thinks it is inappropriate for people to
move as often as he does.  








With regard to placement of the children with
Bobby A. and Janet, Jones testified that there are no current concerns about
drug use in that home because Bobby A. and Janet have tested negative every
time following the initial drug test after S.A. and Z.A. were removed.  She stated that Bobby A. has had a full-time
job and was able to complete his service plan in six weeks.  Janet also had completed the service plan in
six weeks, which included a drug and alcohol evaluation. 

With regard to Emily=s
parents= home
study, Jones testified that there were concerns regarding Judy=s
prescription medications, whether she would be able to stand up to Emily, and
why she did not complete a drug assessment or family therapy.  Jones stated that she had asked Judy to take
a hair follicle test, but she never received documentation showing whether the
test was performed. Jones admitted that she had never made a formal request
that Judy submit to a  drug
assessment.  Jones had also requested
that Judy provide her a list of the medications that she was taking and the
reason that they were prescribed to her, but Jones never received such
list.  However, based on the number of
pills that Judy possessed, she was concerned about placing S.G. with Judy. 

 

 








3.     Emily=s and
Michael=s Synopses of Their Compliance

Emily testified that she had received a service
plan for S.A. and had completed it.  She
explained that she made all of the scheduled visits and that they went Aquite well.@  She said that she and her mother had attended
counseling.  She said that she had
difficulty arranging transportation to Dallas for her service plan and that she
had talked to Jones about her problems with transportation.  Emily admitted that several of her drug tests
had come back positive for controlled substances.  She also admitted that the doctor had told
her to go to Narcotics Anonymous and Alcoholics Anonymous, but she had not done
so.  








Michael acknowledged that he had received a
service plan, but he said that A[i]t
asked quite a bit of [him], more than it=s
probably normal for a human being to do and go to work.@  He said that he and Emily are not trying to
get their children back and that they gave up their children because they knew
that they were not financially capable of caring for them.  However, he said that they had completed the
entire service plan anyway.  Thereafter,
he said that he had not completed the service plan for S.G. and that he had not
received a service plan for S.G.; he thought Emily had received the service
plan for S.G.  He said that he had five
to seven visits with S.G. and that Emily had visited S.G. every week.  He said that CPS had set up classes in Dallas
knowing that they did not have a vehicle and that CPS had set up parenting
classes that he and Emily did not have money to pay for.  Therefore, he felt that he had been sabotaged
by CPS. 

F.      Disposition

After hearing the above evidence, the trial court
entered an order terminating Emily=s and
Michael=s
parental rights and placing all three children with Bobby A. and Janet.  This appeal followed.

III.  Burden of Proof and Standard of Review

In proceedings to terminate the parent‑child
relationship brought under section 161.001 of the family code, TDFPS must
establish one or more of the acts or omissions enumerated under subdivision (1)
of the statute and must also prove that termination is in the best interest of
the child.  Tex. Fam. Code Ann. ' 161.001
(Vernon Supp. 2006); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex.
Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987).  Because of the elevated status of parental
rights, the quantum of proof required in a termination proceeding is elevated
from the preponderance of the evidence to clear and convincing evidence.  Santosky v. Kramer, 455 U.S. 745, 758‑59,
102 S. Ct. 1388, 1397 (1982); see also Tex.
Fam. Code Ann. ' 161.001.








The higher burden of proof in termination cases
alters the appellate standard for both legal and factual sufficiency
reviews.  In re J.F.C., 96 S.W.3d
256, 265 (Tex. 2002); In re C.H., 89 S.W.3d 17, 25 (Tex. 2002); In re
J.T.G., 121 S.W.3d 117, 124 (Tex. App.CFort
Worth 2003, no pet.).  Both legal and
factual sufficiency reviews in termination cases must take into consideration
whether the evidence is such that a fact-finder could reasonably form a firm
belief or conviction about the truth of the matter on which TDFPS bears the
burden of proof.  J.F.C., 96
S.W.3d at 265‑66; C.H., 89 S.W.3d at 25; J.T.G., 121 S.W.3d
at 124.  








Accordingly, in determining a factual sufficiency
issue, we must give due consideration to evidence that the trier of fact could
reasonably have found to be clear and convincing and then determine whether,
based on the entire record, a fact-finder could reasonably form a firm
conviction or belief that the parent violated one of the provisions of section
161.001 and that the termination of his or her parental rights would be in the
child=s best
interest.  Tex. Fam. Code Ann. '
161.001; C.H., 89 S.W.3d at 25. 
In reviewing the factual sufficiency of the evidence, we must consider
all the evidence in the record, both that in support of and contrary to the
trial court=s findings.  C.H., 89 S.W.3d at 27‑29.  Additionally, we must consider whether
disputed evidence is such that a reasonable trier of fact could not have
reconciled that disputed evidence in favor of its finding.  J.F.C., 96 S.W.3d at 266.  If the disputed evidence is of such magnitude
that a trier of fact could not reasonably have formed a firm belief or
conviction that its finding was true, then the evidence is factually
insufficient.  Id. 

IV.  Factually Sufficient Evidence Regarding
Endangering 

Course
of Conduct

 

In their second and third issues, both Emily and
Michael argue that the evidence is factually insufficient to establish that
they endangered their children.  TDFPS
argues that there is ample evidence to support the trial court=s
endangerment findings under sections 161.001(1)(D) and (E) of the family code. 








Endangerment means to expose to loss or injury,
to jeopardize.  Boyd, 727 S.W.2d
at 533; J.T.G., 121 S.W.3d at 125; see also In re M.C., 917
S.W.2d 268, 269 (Tex. 1996).  To prove
endangerment under subsection (D), TDFPS had to prove that Emily and Michael
(1) knowingly (2) placed or allowed their children to remain (3) in conditions
or surroundings that endangered their physical or emotional well‑being.  See Tex.
Fam. Code Ann. ' 161.001(1)(D).  Under section 161.001(1)(E), the relevant
inquiry is whether evidence exists that the endangerment of the children=s
physical well‑being was the direct result of Emily=s and
Michael=s
conduct, including acts, omissions, or failures to act.  J.T.G., 121 S.W.3d at 125; see Tex. Fam. Code Ann. '
161.001(1)(E).  Additionally, termination
under section 161.001(1)(E) must be based on more than a single act or
omission; a voluntary, deliberate, and conscious course of conduct by the parent
is required.  J.T.G., 121 S.W.3d
at 125; see Tex. Fam. Code Ann.
'
161.001(1)(E).  However, it is not
necessary that the parent=s conduct be directed at the
children or that the children actually suffer injury.  Boyd, 727 S.W.2d at 533; J.T.G.,
121 S.W.3d at 125.  The specific danger
to the children=s well‑being may be
inferred from parental misconduct standing alone.  Boyd, 727 S.W.2d at 533; In re R.W.,
129 S.W.3d 732, 738 (Tex. App.CFort
Worth 2004, pet. denied).  To determine
whether termination is necessary, courts may look to parental conduct occurring
both before and after the children=s
birth.  In re D.M., 58 S.W.3d 801,
812 (Tex. App.CFort Worth 2001, no pet.).








Stability and permanence are paramount in the
upbringing of children.  See In re
T.D.C., 91 S.W.3d 865, 873 (Tex. App.CFort
Worth 2002, pet. denied).  A fact-finder
may infer from past conduct endangering the well‑being of the children
that similar conduct will recur if the children are returned to the
parent.  See In re D.L.N., 958
S.W.2d 934, 941 (Tex. App.CWaco
1997, pet. denied), disapproved on other grounds by J.F.C., 96
S.W.3d at 256, and C.H., 89 S.W.3d at 17.  Drug use and its effect on a parent=s life
and her ability to parent may establish an endangering course of conduct.  Dupree v. Tex. Dep=t of
Protective & Regulatory Servs., 907 S.W.2d 81, 84 (Tex. App.CDallas
1995, no writ).

Evidence of criminal conduct, convictions, and
imprisonment prior to the birth of a child will support a finding that a parent
engaged in a course of conduct that endangered the child=s
well-being.  J.T.G., 121 S.W.3d at
133.  While imprisonment alone does not
constitute a continuing course of conduct that endangers the physical or
emotional well-being of a child, it is a fact properly considered on the issue
of endangerment.  Boyd, 727 S.W.2d
at 533-34; R.W., 129 S.W.3d at 743-44.

The record contains substantial evidence of
subsection (D) environmental endangerment and subsection (E) course of conduct
endangerment to the physical or emotional well‑being of the
children.  Because the evidence
concerning these two statutory grounds for termination is interrelated, we
consolidate our examination of it.  See
J.T.G., 121 S.W.3d at 126.








The record demonstrates that Emily suffered from
bipolar disorder and had a history of illegal drug use, including during one of
her pregnancies.  Emily admitted that she
had used marijuana while she was pregnant with Z.A.  Although Emily did not admit to using drugs
while she was pregnant with S.A., CPS removed S.A. after she ingested methadone
while she was with Emily at a neighbor=s
house.  Emily also testified that she had
used methamphetamine and that she had overdosed on crack cocaine laced with
PCP.  Emily also admitted that she takes
prescription medications along with illegal drugs.  She was still struggling with her drug
addiction at the time of the termination trial and planned to check herself
into rehab.

In addition to her drug addiction, the record
reveals that Emily exhibited a pattern of uncontrolled anger that often
resulted in her infliction of physical harm upon Michael.  Michael testified regarding Emily=s
stabbing him, tackling him, and hitting him. 
Emily=s mother confirmed that she had
seen Emily hit Michael and described Emily and Michael=s
relationship as Aviolent.@  

In addition to the emotional instability
exhibited by Emily, she also exhibited instability in her living arrangements
by testifying that she could have lived five places in the last year, and the
motel room where she and Michael were living when they were visited by the CASA
volunteer was filthy and in a bad part of town.

The record also shows that Emily has a criminal
history.  She was arrested for forgery,
possession of a controlled substance, and prescription fraud.








The record reveals that, like Emily, Michael had
a history of illegal drug use, lived in multiple places, and had a criminal
history.  Michael admitted that he had
been doing drugs for twenty years and that he used Aany and
everything@ that would get him high.  He stated that he had been to rehab five
times, but he still relapses with drugs and alcohol.  He said that doing drugs is normal for him
and is not an addiction.

The record demonstrates that Michael liked to
move and that he did not want to live anywhere for more than six months.  As noted above, he was living with Emily in
the filthy motel room that was located in an unsafe part of town.

The record reveals that Michael had an extensive
criminal history and that he was in jail at the time of the termination
trial.  He admitted to having been on
probation for domestic violence and being charged with misdemeanor driving
while intoxicated on four occasions. 
When he was arrested for forgery, he was in the car with S.G. and drug paraphernalia.  Although Michael testified that he was not
the aggressor during the physical fights with Emily and did not get violent
around her, he admitted that he gets violent toward the police and had been to
anger management classes.








Both Emily and Michael argue that their children
were endangered by other people=s drug
use, that they never fought around the children, and that it was acceptable for
them to move frequently because their children were not living with them.  However, endangering acts need not be
directed at the children or cause actual injury or threat of injury to the
children, and as mentioned above, endangerment may include what parents do both
before and after the birth of a child.  In
re U.P., 105 S.W.3d 222, 233-34 (Tex. App.CHouston
[14th Dist.] 2003, pet. denied); see also D.M., 58 S.W.3d at 812.

We have carefully reviewed the entire
record.  Giving due consideration to
evidence that the fact-finder could reasonably have found to be clear and
convincing, we hold that a reasonable trier of fact could have formed a firm
belief or conviction that Emily and Michael knowingly placed S.A., Z.A., and
S.G. in conditions and engaged in conduct that endangered the children=s
physical or emotional well‑being.  See
Tex. Fam. Code Ann. '
161.001(1)(D), (E); J.F.C., 96 S.W.3d at 265-66; C.H., 89 S.W.3d
at 25; J.T.G., 121 S.W.3d at 124; In re T.J., No. 02-05-00353-CV,
2006 WL 820518, at *6 (Tex. App.CFort
Worth Mar. 30, 2006, no pet.) (mem. op.) (holding that mother=s and
father=s
criminal history and illegal drug use provided sufficient basis to establish
environmental endangerment and course of conduct endangerment).  Accordingly, we hold that the evidence is
factually sufficient to support the trial court=s
finding on environmental endangerment and course of conduct endangerment.  We overrule Emily=s second
and third issues and Michael=s second
and third issues.








Emily and Michael also challenge the factual
sufficiency of other statutory grounds for termination that were alleged by
TDFPS.  Only one finding under section
161.001(1) is necessary, however, to support a judgment of termination.  Tex.
Fam. Code Ann. ' 161.001(1); In re J.J.O.,
131 S.W.3d 618, 630 (Tex. App.CFort
Worth 2004, no pet.); see also Tex. Dep=t of
Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex. 1990) (op. on reh=g).  Accordingly, because we have held that
factually sufficient evidence exists to support the trial court=s
finding under family code section 161.001(1)(D) and (E), we need not address
Emily=s and
Michael=s fourth
issues.  See Tex. Fam. Code Ann. 

'
161.001(1); Tex. R. App. P. 47.1;
J.J.O., 131 S.W.3d at 630.

V.  CPS Made Reasonable Efforts To Return The
Children To Emily








In her fifth issue, Emily argues that the
evidence is factually insufficient to support a finding that CPS made
reasonable efforts to return the children to her.  To the contrary, the evidence reveals that
TDFPS prepared several service plans that were designed to help Emily; however,
she failed to complete them.  Although
Emily was supposed to schedule her own appointments for the services, the
record shows that S.G.=s case worker attempted to help
Emily comply with her service plan by making appointments for her drug referral
and individual counseling.  Emily,
however, chose not to find transportation to these services even though she was
able to find transportation to the visits with S.G. every week.  Emily also chose not to attend visits with
S.A. and Z.A. for over two years. 
Throughout the time that CPS attempted to reunite Emily with her
children by providing her with the phone numbers and addresses of services that
would help her, Emily refused to comply with the service plan and instead
continued using illegal drugs, engaging in criminal activity, fighting with
Michael, changing residences, and remaining unemployed.  In light of these circumstances, Emily
concedes that she is not in a position to care for her children; yet, she still
believes that CPS should have returned her children to her.  

Having reviewed the entire record, we conclude
that Emily=s noncompliance with the service
plans prevented the children from being reunited with her, despite the
Department=s best efforts otherwise.  Therefore, we hold that a fact-finder could
reasonably form a firm belief that under these circumstances, the Department
made reasonable efforts to reunite the children with Emily.  See Tex.
Fam. Code Ann. ' 161.001(1)(N)(I);  In re K.M.B., 91 S.W.3d 18, 25 (Tex.
App.CFort
Worth 2002, no pet.) (holding that State showed that it made reasonable efforts
to return child to mother but mother did not complete service plans).  We overrule Emily=s fifth
issue.

 

 








VI.  Termination Was In The Children=s Best
Interest

In their first issue, both Emily and Michael
argue that the evidence is factually insufficient to support the trial court=s
finding that termination of their parental rights was in the children=s best
interest.  TDFPS argues that there is
ample evidence to support the trial court=s Abest
interest@
finding. 

A strong presumption exists that the best
interest of a child is served by maintaining the custody of a parent.  In re W.E.C., 110 S.W.3d 231, 240
(Tex. App.CFort Worth 2003, no pet.).  The fact-finder may consider a number of
factors in determining the best interest of the child, including the
following:  (1) the desires of the child;
(2) the emotional and physical needs of the child now and in the future; (3)
the emotional and physical danger to the child now and in the future; (4) the
parental abilities of the individuals seeking custody; (5) the programs
available to assist these individuals to promote the best interest of the
child; (6) the plans for the child by these individuals or by the agency
seeking custody; (7) the stability of the home or proposed placement; (8) the
acts or omissions of the parent which may indicate that the existing parent‑child
relationship is not a proper one; and (9) any excuse for the acts or omissions
of the parent.  Holley v. Adams,
544 S.W.2d 367, 371‑72 (Tex. 1976). 
Some listed factors may be inapplicable to some cases; other factors not
on the list may also be considered when appropriate.  C.H., 89 S.W.3d at 27.








Regarding the first factor, the children did not
testify at trial, but S.A. told her counselor on two occasions that she did not
want to live with Emily and that she feared being taken from AMemaw.@  Testimony from Phillips, the CASA volunteer,
revealed that S.A. and Z.A. are definitely bonded with Bobby A. and Janet and
that Emily is not bonded with the children. 
Phillips said that Emily told her several times that she did not know
how to bond with S.A. and Z.A.  Although
Michael testified that the children know him as their father, he said that they
are very healthy and happy right now with Bobby A. and Janet.  Janet said that S.A. and Z.A. know about S.G.
and ask about her and that she believes that a bond can be formed among the
children.  Janet stated that the
Kennemores have had no contact with S.G. and that she is not sure how much of a
bond there still is between S.G. and Emily=s
parents because S.G. was removed from them when she was seven months old 








Regarding the second factorCthe
children=s
present and future physical and emotional needsCseveral
people testified that Z.A. has asthma and Type I diabetes and therefore needs
special care.  Bobby A. said that he and
Janet received four days of intensive training on how to treat Z.A.=s
diabetes while Z.A. was in the hospital. 
The children=s counselor, Efrain Rodriguez,
testified that Z.A. has anger, fear, and aggression and constantly asks where
his grandma is during his visits with Emily. 
Rodriguez said that Z.A. struggles with accepting no and that Z.A.=s
diabetes could play into his irritability. 
The testimony at trial revealed that S.A. needed speech therapy.  Rodriguez testified that S.A. has exhibited
signs of sexual abuse and has referred to herself as Asexy.@  He said that S.A. has an unusual amount of
aggression and that he is helping her process her aggression.  S.A. has told him that Emily is not nice, and
S.A. wets the bed after her visits with Emily. 
Rodriguez said that his impression is that S.A. experiences anxiety
regarding visits with Emily and has troubling emotions like sadness and anger,
which sometimes cause her to regress in her speech.  He is working with S.A. on identifying
feelings, decreasing dependency, and increasing self-reliance.  He stated that if he continues to see these
behaviors in S.A. and Z.A. in a year or two, he would probably recommend a
consultation with a pediatric psychiatrist for possible medications because
their level of aggression and defiance is bordering on oppositional/defiant
disorder. 








The environmental endangerment and endangering
course of conduct discussion above addressed the third, fourth, and eighth
factorsCthe
present and future physical and emotional dangers to the children, as well as
Emily=s and
Michael=s
parenting abilities, or lack thereof, and their acts and omissions.  Additionally, Rodriguez testified about the
visit that he observed between S.A. and Emily in May 2006.  He said that Emily whispered to S.A. about
placement issues regarding S.G., which created parentification with S.A.=s having
to be the  grown-up.  Although Rodriguez noted that there was some
appropriate interaction between Emily and S.A., he heard Emily admonish S.A.
not to call her grandmother AMom@ because
she (Emily) is the AMom.@ 

Concerning the fifth factor, Emily and Michael
utilized some of the programs offered by CPS but did not take full advantage of
them or complete their service plans. 
Emily was planning to voluntarily check herself into rehab, and Michael
was planning to utilize church to combat his drug and alcohol problems. 

Regarding the parties= plans
for the childrenCthe sixth factorCEmily
testified that she is not in a position at this moment to care for her three
kids because she wants to put herself in rehab. 
Emily would like S.G. to be placed with her parents, and she would like
S.A. and Z.A. to be placed with Michael=s
parents.  However, she still wants to
have contact with her children, and she wants the children to know that she is
their mother.  She said that she would
consent to supervised visits as long as Janet was not the one doing the
supervising. 








Michael testified that he does not want his
rights terminated.  However, he stated
that, at this time, getting his children back is not an option and that he does
not want them back right now because he cannot afford them.  Specifically, he said that he and Emily are
not in a position to parent right now because he is in jail, and Emily is
financially unable to parent the children. 
However, he testified that he loves his children; that it is his
intention to work toward getting his life together; that it is his goal to make
the children=s separation from him as short
as possible; and that if he does not get his life together, he would like Emily
to have the opportunity to parent the children. 
He would not mind having supervised visits with the children, as long as
his family does the supervising, not CPS. 
In the meantime, he wants Z.A. and S.A. to live with his parents and
S.G. to live with Emily=s parents. 

Judy testified that she wants S.G. to stay with
her and to have contact with her siblings. 
Judy does not believe that Emily=s and
Michael=s
parental rights should be terminated. 
Instead, she believes that they should still be allowed to have
supervised visits with their children. 

Bobby A. explained that it is his and Janet=s plan
to adopt the three children, so he asked the court to terminate Emily=s and
Michael=s
parental rights to all three children and to place all three children with him
and Janet.  Janet testified that she
believes the siblings should be together as a family and that it is in the
children=s best
interest to place them with her and Bobby A.








Rodriguez, the licensed professional counselor
who has been seeing S.A. and Z.A., testified that he has no reservations about
S.A.=s and
Z.A.=s
placement with Bobby A. and Janet.  He
also testified that he would not object to placement of S.G. with Bobby A. and
Janet. 

Phillips, the CASA volunteer who observed Emily
visiting with the children and who made visits to Emily and Michael=s hotel
room as well as to the grandparents= houses,
recommended that S.A. and Z.A. be placed with Bobby A. and Janet and that S.G.
be placed with the Kennemores.  However,
she admitted that Bobby A. and Janet provide the safest and most relevant
placement for the children and that placing S.G. with Bobby A. and Janet would
promote the three siblings= being
together. 

Jones, the ongoing caseworker for Emily and
Michael=s
children, testified that she has no objections to the children=s
staying in Bobby A. and Janet=s
home.  Jones further testified that she
does not think it is in the children=s best
interest to have Bobby A. and Janet supervise visits with Michael; instead, she
does not think that Michael should have any relationship with his children.  Jokisch testified that is the Department=s plan
for S.G. to be placed with the Kennemores. 









Kimberly Bailey testified that she is Mary
Jokisch=s
supervisor with TDFPS.  She said that it
was her recommendation that Emily=s
parents= home
study be denied and that S.G. not be placed with Emily=s
parents.  Bailey testified that she based
her recommendation on the fact that the person who completed the home study had
reservations about approving it and recommending the placement due to concerns
that Judy was abusing prescriptions. 
Bailey explained that the Department has a philosophy of keeping
siblings together, but that Bobby A. and Janet do not have a relationship with
S.G.  Bailey testified that CPS is asking
that S.G.=s parents= rights
be terminated, that the Department be named the permanent managing conservator
of S.G., and that Bobby A. and Janet be named as the permanent managing
conservators of S.A. and Z.A.  Bailey
said that placing S.G. with the Kennemores is in S.G.=s best
interest because she will be with family. 

Regarding the stability of the proposed placementCthe
seventh factorCthe evidence demonstrated that
Bobby A. and Janet planned to adopt the three children.  The evidence showed that Bobby A. and Janet
have been married for a significant period of time, that he has a stable job,
and that Janet can stay home with the children. 
Although there were some concerns about the children=s being
exposed to drugs, the record reveals that Bobby A. and Janet have not tested
positive for drugs since the test following the drug raid.  The other proposed placements left lingering
questions such as Judy=s possible abuse of prescription
medications and whether S.G. would bond with the Kennemores, who had never
interacted with her.








Finally, concerning the ninth factorCany
excuse for the parents= acts or omissionsCEmily
and Michael both raised the lack of transportation and lack of financial
resources as an excuse for their failure to complete their service plans.  However, the record revealed that Emily was
able to arrange transportation to the visits with her children.  Michael said that he felt that CPS had
intentionally sabotaged them by scheduling their services in Dallas even though
they lived in Euless.








Although Emily and Michael argue that the
children could have remained with Bobby A. and Janet without resorting to
termination, the trial court heard testimony from Rodriguez and the CPS workers
that termination of Emily=s and Michael=s
parental rights was in the children=s best
interest.  Giving due consideration to
evidence that the fact-finder could have reasonably found to be clear and
convincing, and based on our review of the entire record, we hold that a
reasonable trier of fact could have formed a firm belief or conviction that the
termination of Emily=s and Michael=s
parental rights would be in the children=s best
interest.  See In re S.M.L., 171
S.W.3d 472, 480 (Tex. App.CHouston
[14th Dist.] 2005, no pet.) (holding that clear and convincing evidence existed
that termination of father=s
parental rights was in child=s best
interest where, among other factors, father was incarcerated at time of
termination hearing and had a pattern of criminal and violent conduct).  Accordingly, we hold that the evidence is
factually sufficient to support the trial court=s
best-interest finding.  We overrule both
Emily=s and
Michael=s first
issues.

VII.  Conclusion

Having overruled Emily=s first,
second, third, and fifth  issues, we
affirm the trial court=s order terminating her parental
rights to S.A., Z.A., and S.G.  Having
overruled Michael=s first, second, and third
issues, we affirm the trial court=s order
terminating his parental rights to S.A., Z.A., and S.G. 

 

SUE WALKER

JUSTICE

 

PANEL F: 
CAYCE, C.J.; LIVINGSTON and WALKER, JJ.

 

DELIVERED: May 17, 2007











[1]The termination paperwork
initially listed this child as AS.D.A.@  However,
at the outset of the termination trial, Emily=s attorney mentioned that
a trial amendment had been made in December 2005 changing AS.D.A.@ to AS.D.G.@  Therefore, we will refer to this child by AS.G.,@ despite the fact that
the final order failed to reflect the trial amendment.





[2]See Tex. R. App. P. 47.4.





[3]Emily testified that she
was arrested in February 2003 for assault, but she said that the charges were
false. 





[4]However, Michael
testified that Emily is lying if she says that she is on drugs right now
because she does not have money to do drugs. 





[5]She also mentioned taking
hydrocodone for carpal tunnel syndrome in her hands.  





[6]Michael also admitted
that all of his brothers have drug problems. 





[7]Emily testified that
Michael has a drinking problem.  





[8]Emily said that although
Michael has completed drug rehabilitation, he continues to struggle with a drug
problem.  





[9]Michael testified that
the drugs found at his parents= house were his brother=s.  However, he said that his stepmother had
smoked marijuana during his entire life and that at his home there was daily
marijuana use similar to a cocktail hour. 





[10]Emily and Michael both
testified that he had a beer in his hand, not a crack pipe, when Phillips
arrived.